**Ibnomer M. SHARAFELDIN Plaintiff**

v.

**State of MARYLAND, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, Defendant.**

**No. CIV H–99–2940.**

United States District Court, D. Maryland.

Feb. 13, 2001.

Fatai A. Suleman, Amorow & Kum, PA, Hyattsville, MD, for plaintiff.

Scott S. Oakley, Assist. Atty. Gen. of Maryland, Baltimore, MD, for defendant.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, Senior District Judge.

Plaintiff Ibnomer M. Sharafeldin ("Sharafeldin") was formerly employed as a prison chaplain by the State of Maryland, Department of Public Safety and Correctional Services (the "Department"). In this civil action, Sharafeldin has sued the Department under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Claims of hostile work environment and constructive discharge have been asserted.

Pursuant to Scheduling Orders entered by the Court, the parties have engaged in extensive discovery.[1] Presently pending before the Court is defendant's motion for summary judgment. The parties have submitted lengthy memoranda and numerous exhibits in support of and in opposition to the pending motion, including affidavits and excerpts from various depositions taken during discovery. A hearing has been held in open court. For the reasons stated herein, defendant's motion for summary judgment will be granted.

I

*Background Facts and Procedural History*

Sharafeldin is a black male of Sudanese origin and is a practicing Muslim. From August 11, 1989 until July 30, 1991, he was a "contractual employee" of the Department. From July 31, 1991 until June 8, 1999,[2] Sharafeldin was employed by the Department on a full-time basis as an Islamic Chaplain at the Maryland Correctional Training Center (the "MCTC") in Hagerstown, Maryland.

Plaintiff has a long history of filing charges of discrimination against the Department. Indeed, he was hired on a full-time basis in 1991 only after he had filed a charge of discrimination with the Maryland Commission on Human Relations (the "MCHR") and the Equal Employment Opportunity Commission (the "EEOC"). Since 1991, Sharafeldin has filed charges of discrimination against the Department on some seven occasions.[3] His most recent charge and the basis for this suit was filed with the MCHR on December 4, 1998.[4] On July 9, 1999, the EEOC issued to Sharafeldin a "Right to Sue" letter.

Proceeding *pro se,* Sharafeldin filed in this Court on September 27, 1999 a "Complaint for Employment Discrimination" (the "*Pro Se* Complaint"). Sharafeldin's *Pro Se* Complaint alleged in general terms employment discrimination by the Department and various Department officials on the basis of his race, color, religion and national origin. Thirty-five exhibits, totaling almost 300 pages were attached to the *Pro Se* Complaint.

In January of 2000, Sharafeldin obtained private counsel, and on February 18, 2000, counsel filed an amended complaint containing three counts. Count I alleges hostile work environment harassment on the basis of Sharafeldin's race, color, religion and national origin. Count II asserts a claim of constructive discharge based on the alleged hostile work environment harassment encountered by plaintiff. Count III alleged a claim of breach by the defendant of a settlement agreement between the parties dated February 24, 1995, whereby Sharafeldin had consented to withdraw all previously filed charges of discrimination which had been brought against the Department and which were pending at that time. In each Count of his amended complaint, Sharafeldin seeks $5,000,000 as compensatory damages, $5,000,000 as punitive damages and attorneys' fees and costs.

Responding to the amended complaint, the Attorney General of Maryland, appearing on behalf of the Department, filed a motion to dismiss the amended complaint. In its Memorandum and Order of April 11, 2000, this Court denied defendant's motion to dismiss Counts I and II of the amended complaint, but granted defendant's motion

---

1. Plaintiff's deposition was taken over a period of some two days. The Court has now had an opportunity to review the transcript of that deposition in its entirety.

2. Although Sharafeldin performed no duties after August 21, 1998, he remained on the Department's payroll until June 8, 1999.

3. One of those charges alleged sexual harassment and was based on the claim that he had been subjected to discrimination because of his sex.

4. In that charge, plaintiff's sole claim was that he had been harassed and discriminated against because of his religion.

to dismiss Count III. Count III of the amended complaint was dismissed on the ground that it was barred by the State of Maryland's sovereign immunity. As to Counts I and II, the Court concluded that there were material jurisdictional facts in dispute making dismissal of plaintiff's claims as a matter of law inappropriate at that early stage of the case. (Slip op. at 11). The parties were directed to develop the facts by way of discovery. *Id.* The Court noted that defendant, after discovery had been completed, would be entitled to later challenge Counts I and II by way of a motion for summary judgment. *Id.* at 12.

Thereafter, plaintiff filed a motion for leave to file a second amended complaint which sought to add a new Count III asserting a claim that the Department had unlawfully failed to transfer Sharafeldin to another correctional facility. On June 12, 2000, the Court entered an Order denying plaintiff's motion to amend on the ground that the new count was insufficient on its face because the Department's challenged conduct did not constitute an adverse employment action under Title VII.·

Beginning in 1992, Sharafeldin began to memorialize employment incidents which he believed were based on defendant's discriminatory treatment and to submit incident reports to the Department. In his answers to defendant's interrogatories, Sharafeldin has described thirty-eight separate "acts" of alleged discrimination which occurred between December 1, 1992 and August 21, 1998. Included are claims that he was assaulted, that he was the subject of hate mail, that he was harassed in connection with the performance of his duties as administrative chaplain and that he was subjected to disparate treatment.

The primary focus of plaintiff's suit is based on an alleged assault which occurred on August 21, 1998. At approximately 9:00 p.m. on that date, an inmate informed Sharafeldin that Officer Smith, a correctional officer, was spying on the inmate as he was typing a letter for Sharafeldin. Prison policy did not permit an inmate to perform personal services for a chaplain or other employee of the Department. Believing that the inmate was performing personal services for Sharafeldin, Officer Smith reported the problem to Captain Troupe ("Troupe"). Troupe in turn contacted Major McCauley ("McCauley"),[5] and both Troupe and McCauley immediately went to see Sharafeldin at his office.

Troupe and McCauley then questioned Sharafeldin about the letter. The document in question was a report about an investment scam in which Sharafeldin had become a victim. According to Sharafeldin, he had decided that, as a correctional employee and a citizen, he had a civic duty to report the scam to state and federal authorities.[6] A dispute then arose as to whether Sharafeldin could take the two-page letter and make copies of the pages which Troupe and McCauley were holding. When plaintiff attempted to leave with copies of the document, both Troupe and McCauley blocked his path. According to Sharafeldin, McCauley shook his fist, made threatening remarks and pushed Sharafeldin against a desk causing him to bruise his hand and shin. Sharafeldin then left the MCTC and went to the emergency room of the Washington County Hospital where he was treated for mild contusions on his right hand and his right shin.[7] The

---

5. At the time, McCauley held the Departmental rank of Major.

6. Sharafeldin concedes that prison policy did not permit an inmate to type a personal letter for him.

7. According to McCauley's testimony at his deposition, Sharafeldin became angry during this incident and began yelling when he was informed that McCauley intended to give a copy of the letter to Assistant Warden Stouffer. An argument then ensued. According to McCauley, Sharafeldin snatched a page of the letter from Troupe, held it behind his back and refused to return it. When McCauley attempted to grab the paper back, there was physical contact with Sharafeldin who fell against a wooden desk and injured himself.

next day, Sharafeldin filed criminal assault charges against McCauley in the District Court for Washington County. Those charges were later *nol prossed.*

According to the incident report filed by plaintiff, "both Mr. McCouley [*sic*] and Mr. Troupe were motivated against me by race and religion and ethnic origin." Although many other incidents are relied upon here by Sharafeldin in support of his claims, the alleged assault of August 21, 1998 was the basis for the administrative charge of discrimination which he filed with the MCHR and which later led to the filing of this suit.[8]

According to Sharafeldin, as a result of the assault on August 21, 1998, he suffered from post traumatic stress disorder ("PTSD"). He was treated by a psychiatrist for this condition and did not return to work after August 21, 1998, claiming that his PTSD made it impossible for him to resume his work at the prison. Later, in June of 1999, he was removed from the Department's payroll. In Count II of the amended complaint, he has alleged that he was constructively discharged by the Department, and he seeks in that Count a recovery under Title VII for this discharge.

## II

### *Summary Judgment Principles*

It is well established that a defendant moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). Where, as here, the nonmoving party will bear the ultimate burden of persuasion at trial, "the burden on the moving party [at the summary judgment stage] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

One of the purposes of Rule 56 of the Federal Rules of Civil Procedure is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that the defendant may be liable under the claims alleged. *See* F.R.Civ.P. 56(e). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof," then "the plain language of Rule 56(c) mandates the entry of summary judgment." *Catrett,* 477 U.S. at 323, 106 S.Ct. 2548.

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick,* 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 640 (E.D.N.C. 1966), *aff'd,* 388 F.2d 987 (4th Cir.1967), *cert. denied,* 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477

---

Troupe corroborated McCauley's account of the incident.

8. In his charge, Sharafeldin indicated that "8/21/98" was the date when the "Discrimination Took Place."

U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In the absence of the necessary minimal showing by the plaintiff that the defendant may be liable under the claims alleged, the defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. *See Catrett,* 477 U.S. at 323–24, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Catrett,* 477 U.S. at 323–24, 106 S.Ct. 2548).

Applying these principles to the facts of record here, this Court has concluded that defendant's motion for summary judgment must be granted.

## III

### *Applicable Law*

■ Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, ... or national origin." 42 U.S.C. § 2000e–2(a)(1). Racial, religious or national origin harassment which creates a "hostile work environment" is actionable under Title VII because it amounts to discrimination in the conditions of employment. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 63–68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ To establish his claim of hostile work environment, Sharafeldin must prove (1) that the conduct in question was unwelcome; (2) that the alleged harassment was based on his race, religion or national origin; (3) that the harassment was sufficiently severe or pervasive to alter the condition of his employment and to create an abusive working environment; and (4) that there is some basis for imposing liability on the employer. *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 241 (4th Cir.2000); *Hartsell v. Duplex Products,* 123 F.3d 766, 772 (4th Cir.1997); *White v. Federal Exp. Corp.,* 939 F.2d 157 (4th Cir.1991); *Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir.1987).

■ In order to be actionable under Title VII, a racially, religiously or ethnically objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To determine whether an employer's alleged conduct was sufficiently severe or pervasive to bring it within the proscription of Title VII, a court must examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Beardsley v. Webb,* 30 F.3d 524, 529 (4th Cir.1994) (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Title VII does not prohibit "genuine but innocuous differences" in the ways that persons interact during their employment with each other. *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The prohibition of harassment forbids only "behavior so objectively offensive" as to alter the terms or conditions of the plaintiff's employment. *Id.* at 80, 81, 118 S.Ct. 998.

■ To establish a claim of constructive discharge under Title VII, an employee must prove that intolerable working conditions were deliberately created by the employer in an effort to force the employer to resign. *Taylor v. Virginia Union University,* 193 F.3d 219, 237 (4th Cir.

1999); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1350 (4th Cir.1995); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). If a plaintiff meets his burden of showing that he was constructively discharged, he then bears the further burden of showing that the complained of conduct was motivated by a discriminatory animus against him. *Taylor*, 193 F.3d at 238 (citing *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 517 (7th Cir.1996)).

## IV

### *Claim of Hostile Work Environment Harassment*

#### (a)

#### *Limitations*

■ Defendant first argues that plaintiff's claims based on discriminatory acts occurring prior to April 8, 1998 are barred by limitations. Because Maryland is a "deferral" state, a charge of discrimination must be filed within 300 days of the occurrence. *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 439 (4th Cir.1998). Since a state agency like the MCHR has 60 days in which to resolve the claim on its own, the 300 day limitations period within which a charge must be filed with the EEOC is effectively reduced to 240 days. *Id.* Defendant accordingly contends that the charge which was filed by Sharafeldin with the MCHR and which forms the basis for this suit can permissibly encompass only allegedly unlawful employment practices occurring on or after April 8, 1998.

■ Responding to this contention, plaintiff argues that he has alleged as a part of his hostile work environment claim that the discrimination endured by him was of a "continuing" nature. Under the so-called "serial" violation theory, a plaintiff may be able to recover for discrimina-

tory acts which, although untimely by themselves, emanate from the same discriminatory animus as a timely discriminatory act. *Redding v. Anne Arundel County*, 996 F.Supp. 488, 490 (D.Md.1998).

In previously denying defendant's motion to dismiss as untimely plaintiff's claims based on discriminatory acts occurring prior to April 8, 1998, this Court, in its Memorandum and Order of April 11, 2000, ruled that the allegations of the amended complaint permitted plaintiff to rely on a "continuing violation theory." (Slip op. at 14). The Court accordingly permitted plaintiff to rely on such a theory to defeat a motion to dismiss based on the argument that subject matter jurisdiction did not exist because plaintiff's claims had not been timely brought. *Id.* In so doing, the Court directed the parties to develop by way of discovery the pertinent facts supporting plaintiff's claim that the discrimination experienced by him was of a "continuing" nature.

■ For a plaintiff to be permitted to go forward under a "serial" violation theory, the series must contain a specific "beachhead violation" occurring within the limitations period. *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 869 (1st Cir. 1997). At least one timely discriminatory act must be identified before earlier untimely acts may be considered by the Court. *Id.*

Defendant argues that evidence does not exist in the record here indicating that plaintiff has proved within the limitations period a "beachhead violation" which would permit him to rely on earlier allegations of discrimination. According to defendant, the earlier series of alleged discriminatory acts did not derive from the same discriminatory animus which allegedly occurred on August 21, 1998 because the actions taken by supervisors [9] of plaintiff on that date were not based on any dis-

---

9. Although the Department contends that Troupe and McCauley were not supervisors of plaintiff at the time of the alleged assault, it is not necessary for the Court to decide that issue. The Court will assume that Troupe and McCauley were, under Title VII, supervisors of Sharafeldin on the day in question.

criminatory animus. This Court would agree.

As the Court stated in *Redding:*

A plaintiff must demonstrate both a discriminatory act *within the limitations period,* and a relationship between the act within the limitations period and the acts or events which would otherwise be time-barred, to prevail on a serial violation theory. (Emphasis in original). 996 F.Supp. at 490.

 Here plaintiff Sharafeldin has not demonstrated that a discriminatory act occurred within the limitations period. There was indeed a dispute and physical contact between Sharafeldin and one of his superiors in his office on August 21, 1998. But Sharafeldin had clearly violated a prison rule by permitting an inmate to perform personal services for him. When his superior officers did not permit him to remove copies of the letter typed by the inmate, there was a physical confrontation, and Sharafeldin suffered a minor injury. Whether or not what occurred could be characterized as an intentional act and an assault, there is no evidence that the actions of Troupe and McCauley were based on Sharafeldin's race, religion or national origin. A discriminatory animus cannot be inferred from conduct of supervisors which a plaintiff may deem to be inconsiderate. *Settle v. Baltimore County,* 34 F.Supp.2d 969, 991 (D.Md.1999). "Title VII does not prohibit all verbal or physical harassment in the work place...." *Oncale,* 523 U.S. at 80, 118 S.Ct. 998. Hostility directed at a plaintiff by supervisors does not without more amount to discriminatory harassment. Careful attention must be given by a court to the requirements of Title VII to avoid the risk of transforming the statute into "a general civility code for the American workplace." *Id.*

Since there was no discriminatory animus connected with the incident claimed by plaintiff to be the "beachhead violation", he is not entitled to rely on that event as evidence of discriminatory harassment. Since no beachhead violation has been proved, plaintiff is barred by limitations from relying in this suit on any alleged discriminatory acts occurring before April 8, 1998.

 In addition to the event occurring on August 21, 1998, there are three other incidents which are timely since they occurred after April 8, 1998 and which are claimed by plaintiff to constitute proof of discriminatory harassment. On June 1, 1998, plaintiff received an unsigned letter "On behalf of the Christian population here at M.C.T.C." The letter stated:

"It comes to a point in time when someone or nature...takes a step," and Sharafeldin is "either breeding a society of hate mongers...or giving acquiescence to such."

The letter asked that Sharafeldin

"advise [his] congregation as to their attitudes towards non-Muslims. This is not a democracy, its [*sic* ] Department of Public Safety—Division of Corrections. This is not Sudan."

Evidence of record does not indicate that this letter was authored by any of plaintiff's supervisors or other superiors. Indeed, there is no indication that it was even written by a correctional officer. On its face, the letter discloses that it was written on behalf of the Christian population of inmates at the MCTC. Accordingly, this letter is not evidence of defendant's discriminatory animus.

 On June 10, 1998, Officer Hudson reported to Major McCauley that Chaplain Delores often mishandled her MCTC keys by leaving them unattended in her purse. McCauley forwarded the report to plaintiff since he was the administrative chaplain and asked him as Delores' department head to please instruct her as to proper key control procedures. Sharafeldin claims that McCauley was "trying to wash his hands of the issue" and to shift "blame" to Sharafeldin for the problem. Sharafeldin contends that unlawful discriminatory intent can be inferred from McCauley's

failure to take disciplinary action against Chaplain Delores, who is a white Catholic.

Plaintiff's reliance on this incident as proof of McCauley's discriminatory animus is without merit. The fact that Sharafeldin was asked to investigate the matter and the fact that disciplinary action was not taken against Chaplain Delores do not in any way relate to plaintiff's race, religion or national origin. Plaintiff cannot claim that the Department's failure to take disciplinary action against Delores amounted to disparate treatment. When he had an inmate type a personal letter for him, Sharafeldin also violated Department policy, and disciplinary action was likewise not taken against him.[10]

On June 15, 1998, plaintiff received a short memorandum from Assistant Warden Stouffer. Sharafeldin was asked in that memorandum to investigate the theft, loss or improper disposal of certain items missing from the chapel. Sharafeldin objected, stating that he was not responsible for property in the chapel area, that such a "dysfunctional situation from an administrative point of view" would not be tolerated by him anymore and that he was directing his union representative "to grievance" the matter as soon as possible.

There is no evidence that this dispute between Sharafeldin and the Assistant Warden was related in any way to Sharafeldin's race, religion or national origin. The event in question, like those which occurred on June 1, 1998, on June 15, 1998, and on August 21, 1998, does not therefore constitute proof that plaintiff was subjected to discriminatory harassment.

For these reasons, this Court concludes that plaintiff Sharafeldin has not satisfied his burden of showing that the harassment alleged by him was based on his race, religion or national origin. Since competent evidence of defendant's discriminatory animus does not exist, plaintiff's claim of hostile work environment must fail.

(b)

### Alleged Acts of Harassment

Even if not barred by limitations, the many incidents relied upon by plaintiff, whether considered separately or in the aggregate, do not in any event satisfy plaintiff's burden of showing that during the time of his employment with the Department he was subjected to a racially, religiously or ethnically hostile work environment. Even considering evidence of incidents occurring between 1992 and April of 1998, this Court concludes as a matter of law on the record here that the harassment alleged by plaintiff was not based on his race, religion or national origin.

Sharafeldin was a contentious, disgruntled and paranoiac employee who clashed with almost everyone with whom he came into contact, including inmates, correctional officers, nurses, other chaplains and superiors. He constantly complained about his duties and work assignments. He overreacted to petty slights and inconveniences experienced while performing his duties as an Islamic Chaplain. It was plaintiff's inability to work with others and to comply with the directions of his superiors which led to the claims asserted by him in this case. Whenever disputes or conflicts arose, Sharafeldin attributed them to his race, his religion or his national origin. Undoubtedly, Sharafeldin felt stress, and was diagnosed as suffering from PTSD. But the stress was self-imposed and resulted from his inability to get along with co-workers, superiors and others.

According to Sharafeldin, in December of 1992, he was wrongfully blamed for not conducting security checks on two inmates, and he was pushed against the wall by another chaplain during an argument. He asserts that, at various times in 1993, an-

---

**10.** There is no evidence to support Sharafeldin's contention that he would have been subjected to discipline had he returned to work after August 21, 1998.

other chaplain overheard a conversation implying that Sharafeldin's life was in danger, the Warden at the MCTC refused to endorse his application for a handgun permit, that he received a five day suspension for falsifying time sheets, and that his fingers were injured when a correctional officer slammed the chapel door on his hand. He also complains that, in August of 1993, certain correctional officers made fun of him in the front lobby and giggled at him, that his office was searched by security officers during an investigation, that a female employee threw some forms at him as he was standing in her office, and that his five day suspension was leaked to employees and inmates who then made fun of him. According to Sharafeldin, in 1994, a corrections officer hit him on the shoulder and then laughed; another officer taunted him by questioning whether he had a badge; he was wrongly accused of not keeping proper documentation for an audit, and he was required to undergo counseling for abusing the Department's sick leave policy. He asserts that on several occasions in 1995, various officers displayed a prejudicial attitude towards him by refusing to process passes so that inmates could see him. He also complains that in June of 1995, an officer reported him for failing to give accurate information in connection with a missing inmate and that in October of 1995 an officer closed an automatic gate on his shoulder.

In support of his claim of discriminatory harassment, plaintiff also relies on a number of different incidents which occurred in 1996. He complains that, when a correctional officer made a "handgun gesture" toward him accompanied by a "handgun sound," the chapel officer grinned and laughed, that on two separate occasions a soft drink bottle was found under a tire of his car, that he was wrongly accused of calling for inmates without using passes, that a sticky brown liquid was thrown in his face while he was talking to an inmate through the security grille, that a Protestant chaplain opened the staff bathroom door while he was sitting on the toilet, that

two clinical employees treated him with hostility in connection with his timekeeping, that a nurse made an offensive remark to him while treating him for an eye infection, that someone placed a "jumbo paper clip" with one end "standing vertically" on a chair where he was going to sit while meeting with an inmate, that a nurse and a dental assistant on several occasions forced him to veer to the side and defer to them while they were walking in opposite directions, that he was wrongly chastised for his early departure from a chaplain's meeting, and that he was harassed and intimidated in the lobby of the MCTC when an officer asked for his badge and requested to search his briefcase.

Several of plaintiff's complaints are based on the fact that he had been designated administrative chaplain of the MCTC and that he objected to assuming the responsibilities of that position. He contends that he was harassed when he was blamed for not conducting security checks on two former inmates who had volunteered to work for other chaplains and when he was asked to institute better controls within the chapel area. Sharafeldin vehemently objected to being required to obtain in-service training in 1997, although having been ordered to do so both by Warden Sacchet and later by Warden Moats.

There has been no showing that any of these many alleged acts of harassment were in any way connected with Sharafeldin's race, religion or national origin. There is no evidence that discriminatory, offensive statements were made by any of plaintiff's superiors during the confrontations and other events in question. That Sharafeldin is a Sudanese black and a practicing Muslim and his superiors are Caucasian and are neither Sudanese nor Muslim is hardly proof that the actions of his superiors were motivated by a discriminatory animus. This Court cannot attribute a discriminatory character to the disagreements and misunder-

standings between plaintiff and others based merely on Sharafeldin's conjectural opinions.[11] *See Hawkins v. Pepsico, Inc.,* 203 F.3d 274, 280–81 (4th Cir.2000). A plaintiff's own conclusory assertions of discrimination in and of themselves are insufficient to constitute proof of a defendant's discriminatory animus. *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 (4th Cir. 1989); *Gairola v. Commonwealth of Va. Dept. of General Servs.,* 753 F.2d 1281, 1288 (4th Cir.1985). The standard to be applied is an objective one, namely whether a reasonable person would objectively find that defendant's conduct created a racially hostile work environment. *Harris,* 510 U.S. at 121, 114 S.Ct. 517.

Besides the letter of June 1, 1998 written on behalf of the Christian population of inmates, only two other of the thirty-eight incidents of harassment inferentially relate in any way to plaintiff's race, religion or national origin. On January 11, 1993, plaintiff received in his institutional mailbox an unsigned copy of a 1917 newspaper advertisement in which a $200 reward is offered for the return of "five negro slaves." On January 25, 1993, plaintiff received in his mailbox an unsigned drawing of a "chocolate milk" carton with the picture of an African–American child and the words "Have you seen this child? Rufus Johnson."

Evidence relating to these so-called "hate mail" incidents does not indicate that any one of them can be attributed to plaintiff's supervisors or other superiors. That co-workers or inmates were responsible for these other two incidents is not proof of the Department's discriminatory animus. This Court accordingly concludes that these two incidents do not constitute competent evidence supporting plaintiff's claim of hostile work environment harassment.

■ As noted, most of the many incidents listed by Sharafeldin involved the conduct of other employees of the Department and not that of his supervisors. Discriminatory harassment by a co-worker is not actionable under Title VII. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 760, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Plaintiff has not shown here that the gravity of the harassment alleged was such that the Department failed to take appropriate remedial action. *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 480–81 (7th Cir.1996). The Court would note that many different persons are alleged at different times to have subjected Sharafeldin to discriminatory harassment. Were plaintiff's assertions to be credited, the Court would be compelled to conclude that there existed a widespread conspiracy on the part of numerous employees of the Department to carry out an official policy to discriminate against Sharafeldin on the basis of his race, religion or national origin. Evidence of record does not support any such determination.

■ Plaintiff argues that certain other circumstances give rise to an inference of unlawful harassment. In particular, plaintiff contends that the Department failed to take proper disciplinary action against several white employees and that such failures amounted to racially disparate treatment. According to Sharafeldin, Vicky Carr, a white employee, had an affair with an inmate, and Victoria Lyle, a white psychologist, was having an affair simultaneously with the Warden and an inmate. The fact that no disciplinary action was taken against these two individuals is hardly evidence of racially disparate treatment. In referring to these and other white employees of the Department, plaintiff has not shown that he was similarly situated and therefore subjected to disparate treatment when they were not disciplined. No separate claim of disparate treatment has been asserted by Sharafel-

---

**11.** According to Sharafeldin, it is not a very hidden fact "that almost everybody hates

Muslim chaplains."

din in this case, and there is no evidence that any disparate treatment by the Department resulted in an adverse employment action taken against him. This Court accordingly concludes that none of these alleged disparate treatment incidents related in any way to plaintiff's claim that he was subjected to discriminatory harassment.

· For all these reasons, even if the Court were to consider the many incidents which occurred before April 8, 1998 and which have been relied upon by plaintiff in ·support of his claim of hostile work environment harassment, the record here does not indicate that plaintiff was subjected to harassment based on his race, religion or national origin.

## V

### *Claim of Constructive Discharge*

■ In Count II of the amended complaint, plaintiff has asserted a claim of constructive discharge. To prevail on this claim, Sharafeldin must prove not only that intolerable working conditions were deliberately created by the Department in an effort to force him to resign but also that the conduct complained of was motivated by a discriminatory animus against him. *Taylor*, 193 F.3d at 237–238.

■ Plaintiff contends that the discriminatory harassment imposed upon him by defendant forced him to resign. However, as more fully discussed in Part IV of this Memorandum Opinion, plaintiff has not proved that the working conditions which he found to be intolerable were imposed because of his race, religion or national origin. As noted, the workplace conditions which resulted in the diagnosis that Sharafeldin was suffering from PSTD were undoubtedly stressful to him. However, they arose because of the many conflicts and disputes between Sharafeldin and co-workers and between Sharafeldin and his superiors. The demands placed upon him by his superiors and the incidents which occurred during his employ-

ment have not been shown to have been based in any way on a discriminatory animus on the part of the defendant. For these reasons, plaintiff's claim of constructive discharge must also fail.

## VI

### *Conclusion*

For all the reasons stated herein, this Court concludes that plaintiff has not shown on the record here that defendant is liable for damages under either·Count I or Count II of the amended complaint. Accordingly, defendant's motion for summary judgment will be granted. An appropriate Order will be entered by the Court.